Filed 3/9/15  W.M. v. Superior Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| W.M., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF HUMBOLDT COUNTY, <br><br> Respondent; <br><br> HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND SOCIAL SERVICES et al. <br><br> Real Parties in Interest. | A143528 <br><br> (Humboldt County <br> Super. Ct. No. JV130086) |

**INTRODUCTION**

W.M. (petitioner) is the biological father of D.T.  He petitions this court for extraordinary relief from the juvenile court's order of October 29, 2014, denying his request for modification of the court's prior orders and setting a permanency planning hearing.  (Welf. & Inst. Code, §§ 388, 366.26)[1]  W.M. contends the court abused its discretion in refusing to grant him presumed father status pursuant to *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*)  On December 5, 2014, this court stayed the permanency planning hearing pending further order of this court and, on January 8, 2015,

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

issued an order to show cause why the petition should not be granted.  After careful consideration of the record and the parties' contentions, we deny petitioner's request for extraordinary relief on the merits, affirm the juvenile court's orders, and dissolve the stay forthwith.  This decision is final in this court immediately.  (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

## STATEMENT OF HISTORICAL AND PROCEDURAL FACTS

D.T. was born February 26, 2011.  D.T.'s mother (mother) has three older children.  Between 2000 and 2010, the family had been in and out of the juvenile dependency system due to allegations of general neglect.  On May 13, 2010, the Humboldt County Department of Health and Social Services (Department) substantiated an allegation that one of mother's friends had sexually abused one of her daughters. In addition, between 2006 and 2011, mother suffered several misdemeanor and felony convictions.  In 2009 she was sentenced to prison on a felony drug offense, and in 2011 she was convicted of a misdemeanor violation of Penal Code section 273a, subdivision (a), child endangerment.

In May or June 2010, petitioner had sexual intercourse with mother.  Petitioner is mother's former brother-in-law.

In July or August 2010, when she was approximately two months pregnant with D.T., mother began a relationship with Christine T.  Christine T. was present when mother gave birth in February 2011 and the baby was given Christine T.'s last name on the birth certificate.  Mother and Christine T. separated in September 2012.

In May 2013, mother was arrested for possession of methamphetamine.   Upon her release, she took the girls out of school and disappeared with all the children.  The family was located on June 18, 2013, and the children were taken into protective custody.

*Petition*

On June 20, 2013, the Department filed a juvenile dependency petition alleging D.T. came within the provisions of section 300, subdivisions (b) and (j), due to D.J.'s

2

substance abuse history and her failure to follow through with the case plan ordered in the girls' dependency.

The children were detained. Mark L. was identified as the alleged father and was referred for DNA testing. However, mother reported to the Department she did not know who D.T.'s father was, but suggested that person's first name was Chris. The Department proposed the court order mother "to disclose the names, addresses, telephone numbers, and whereabouts of all possible parents of the child. Furthermore, the Court orders the parent(s) to cooperate with the Humboldt County Department of Health and Human Services staff in establishing the parentage of the child." The court declined to do so.

On July 2, 2013, the court appointed counsel for Christine T. in advance of the contested jurisdictional hearing. On July 24, 2013, Mark L. consented to DNA testing to determine if he was D.T.'s biological father. On July 26, 2013, Christine T. requested the court elevate her to the status of presumed mother. (Fam. Code, § 7611, subd. (d).)

Following mother's submission on a modified petition, the court found the allegations of the petition true and set hearings for determination of parentage and disposition. On September 18, 2013, following a contested hearing on parentage issues, the court granted Christine T. presumed mother status.

***Disposition***

In its disposition report dated October 10, 2013, the Department recommended denial of reunification services to mother and provision of reunification services for Christine T. D.T.'s behavior caused the caretakers to express concerns he might be autistic and he was referred to the Redwood Coast Regional Center (RCDC) for evaluation. Prior to November 18, 2013, D.T. was diagnosed with autism.

A disposition hearing was held on December 10, 2013, at which the court granted reunification services to both mother and Christine T. Shortly thereafter, Mark L.

indicated he was not D.T.'s biological father and no longer wanted to participate in the dependency proceedings.

***Six-Month Review Hearing***

A six-month review hearing was set for June 10, 2014. In its report dated May 29, 2014, the Department indicated D.T. was with a new foster family who was diligently pursuing services through the RCDC and was meeting his developmental needs. D.T. was making excellent progress and his behavior had improved. He appeared to trust his new caretakers and was comfortable with them. Due to health issues, Christine T.'s efforts toward reunification had been marginal, but she had stayed in contact with the Department, which recommended the court extend services for Christine until August 18, 2014, the 12-month benchmark. Mother had had no contact with the Department and had stopped visiting her son. The Department recommended the court terminate services to her.

In May 2014, petitioner learned from his ex-wife that he might be D.T.'s biological father. He quit his job as a dishwasher in New Mexico and moved back to Humboldt County. Within a week of his return, he contacted the Department, which assisted him in obtaining a DNA test.

The six-month review hearing was continued to July 16, 2014, at mother's attorney's request. On July 8, 2014, petitioner appeared at the pretrial hearing and declared his belief he was D.T.'s father. He said he had contacted the county child support and social services offices, and needed assistance filling out the forms he had been given to establish paternity. The court appointed counsel for him.

Petitioner filed a Statement Regarding Parentage on July 15, 2014.[2] In it, petitioner stated mother's sister had informed petitioner "a few weeks ago" he might be

---

[2] Petitioner also appeared in court that day and was excused from appearing the next day.

4

D.T.'s biological father, and he had had no knowledge he might be D.T.'s father until this conversation. He stated he had already submitted a DNA sample.

At the six-month review hearing on July 16, 2014, the court terminated services to mother and extended services for Christine T. until August 12, 2014, the date of the 12-month review hearing.

In its report prepared for the 12-month review hearing, the social worker reported Christine T. had lost contact with the Department, and had stopped visiting D.T. The Department recommended the court terminate services to Christine T. and set a section 366.26 hearing. As for petitioner, the Department reported, "[W.M.] has come forward, stating that he may be the biological father of [D.T.]. To the Department's knowledge, no further steps have been taken." Because he did not provide the Department with a mailing address, and attempts to reach him by telephone had been unsuccessful, no notice of the hearing was sent to him.

At the review hearing held August 12, 2014, the court terminated services to Christine T. and set the section 366.26 hearing for December 10, 2014.

***Section 388 Petition and Hearing***

On September 17, 2014, petitioner filed a written section 388 petition seeking a change of the court's orders terminating reunification services, setting the section 366.26 hearing, and continuing D.T. in foster care. Petitioner averred he was first informed that mother had a child and that he might be the father in May 2014. DNA results confirmed W.M.'s paternity. He wanted the court to "[e]levate [him] to presumed father status or alternatively to *Kelsey S.* father status" and requested either custody of D.T. or reunification services. The petition asserted the change of order would be better for the child because "[i]t is in the best interest of the minor to be raised by a parent whenever possible. It is possible for [D.T.]'s father to safely parent [D.T.]."

5

The court received the Department's response opposing petitioner's requests on September 29, 2014.[3] D.T. was now three years old. Two presumed parents had failed to reunify with him. His current foster family had demonstrated its ability to meet his special needs and wanted to adopt him. The balance of the response detailed the foster family's many efforts on D.T.'s behalf, and D.T.'s growth and accomplishments under their care. The report concluded D.T.'s improved behavior demonstrated "that he is bonded with this family."

The social worker observed that on the few occasions she had spoken to petitioner on the telephone or exchanged text messages with him, petitioner had never "asked a single question about what kind of child [D.T.] is and what his special needs are. He has not offered any information as to how he would take care of [D.T.]." She opined it was not in D.T.'s best interest "to remain in limbo for several more months, at least, while [W.M.] attempts to show he has the competency and resources to provide for [D.T.] and his special needs. [D.T.] came into the system when he was just a little over 2 years old. He then spent 8 months with one care provider, and now has spent 7 months with another. [D.T.] needs and deserves permanency, and it is immediately available to him with his current family who very much wish to adopt him."

A contested hearing was held on October 29, 2014.

Petitioner testified he had known mother for 12 years. He married mother's sister about two years after he met mother. During the five years he was married to his ex-wife, he had a familial friendship with mother. He had sexual intercourse with mother once, after he was divorced, but he did not know when.

He moved to New Mexico about four months after having sex with mother, shortly before Thanksgiving 2010, because his ex-wife's daughter called him and said she missed him. He saw mother once or twice during that four-month interval. He did not

---

[3] Minor's counsel did not file a written response to father's section 388 petition but joined county counsel in opposing it after the hearing.

ask her if she was pregnant, and could not tell if she was pregnant. He had no contact with her during the three years he was in New Mexico. He did have contact with his ex-wife.

He heard a rumor once that mother had a child, but mother did not say anything to him about it, and he did not contact her or his ex-wife about it. Nobody told him how old the child was, and he had no reason to believe the child was his. His ex-wife informed him that mother's child might be his son in March or April 2014, about one month before he moved back to California from New Mexico in approximately May 2014. He quit his job as a dishwasher and moved back to Eureka from New Mexico because he wanted to find out if D.T. was his son.

Around a month after he returned to Eureka, he had a conversation with mother about D.T. He went to his ex-wife's house and she was there. He thinks he went up to her and asked if she had any pictures of D.T. he could see. At this time mother confirmed it was a "possibility" D.T. was his son. Within a week of moving back, he contacted the Department and got a DNA test, which showed a 99.9 percent chance he is D.T.'s biological father.[4] He learned the results three months after he tested. As far as he knows, he has no other children.

Upon learning of the DNA test results, he had some contact with the social worker. He requested visitation. He made it clear he wanted his son. He confirmed the accuracy of the social worker's statement he "had not asked a single question about what kind of child [D.T.] is and what his special needs are." He did not remember if he asked the social worker for information on what he would need to do to be able to get D.T. in his home. He was not given any information as to what actions he would need to take to be able to have his son placed with him.

---

[4] According to the court, the sample was drawn on June 23, 2014 and the results were available on July 3, 2014. Petitioner testified he did not receive the results until September 2014.

He asked the social worker if he could see D.T., but he was not allowed to see him. Petitioner does not have visitation with D.T.

Petitioner was currently living in housing for veterans until he got his own place. He was employed at Taco Bell. If he were given the opportunity to take care of D.T., he would get babysitters lined up to cover for him while he was at work. He worked 30 to 38 hours, five days a week. He had never provided care for an autistic child. He had cared for his stepdaughter and his ex-girlfriend's kids.

After listening to extensive argument by the parties' attorneys and setting forth its reasons in detail, the trial court denied father's section 388 petition. [5] To summarize, the

---

[5] The court's ruling stated:

"[F]irst of all, let me say this, Mr. [M.]. I think you're sincere and well-meaning, and I think that you do have an interest in wanting to establish a relationship. What I have to do is fact based, but also I have to evaluate the law. I've read the authorities, I think from a legal perspective, while perhaps not a factual perspective, and I don't think that any of these cases are factually right on. But *Vincent M.* and *Zacharia D.* obviously give me guidance as far as what the Court has to evaluate here. While it wasn't cited in the pretrial brief, I did read *Andrew L.* I think another citation that's probably valuable is *Sarah C.*, although again, not factually on point.

"The law that the Court has to apply and the considerations the Court has to make are pertinent. It goes to [minor's counsel's] line of questioning relative to attempt to establish a relationship. And *Sarah C.*, the language of that I would quote in *Sarah C.* [a] 1992 case, 8 Cal.App.4th 964. In that case the Court described the biological as the mere biological father who had done almost nothing to develop a relationship with his father (*sic*), either before or during the dependency – I am not suggesting that's necessarily the case here – and who had only vague plans as to how he would care for his daughter.

"So vague plans, I think that was [minor's counsel's] point in that area of inquiry. And particularly with this child, an autistic child, I think that's critical.

"Factually, I don't know what else the Department could have done. Mr. [M.] came forward the first appearance here in the Court file is his appearance in July, and I think it was July 5th. [County counsel] hadn't heard about Mr. [M.] but Mr. [M.] indicated that social services had directed him to Court, that he needed assistance with establishing his paternity. He indicated to my question that he is a possible father of the child. Of course, father is saying that he submitted a genetic sample on June 23rd, 2014, and you know, although I am always hearing how this takes such a long time, here it is by July 3rd they had the answer. So that's pretty quick from my perspective. So we have to

remember, though, where are we in July. We're a month away from a twelve-month review where the reunification services were terminated for the parents. So I – factually, I think also pertinent in this particular case, because all of these cases are different, none of them are the same. I think that I have to look at what did the Department do?

"Did the Department act diligently in providing him with the rights that he might have in this particular case?

"I look at the mother's role and, you know, let's start with the one night stand. Apparently not—a particularly minimal encounter where people were intoxicated, so mother doesn't even identify Mr. [M.] as even a potential father until far later, I suppose. And really what I have are some relatively vague facts. I am not sure who knew what and when they knew it, and what they told other people, because evidence that I have before me today is vague. I have rumors that she might be pregnant. I have – and clearly those rumors could be followed up on. But—but again, you know, one night stand.

"And I agree with you, [father's counsel], in that respect, what is reasonable for him to inquire about in that respect. But clearly I have to consider, as well, the role of the parties. I think that *Kelsey S.* and *Zacharia D.* tell me that. Whereas [biological mother's counsel], hypothetically, we might have a mother who tells a potential biological father that if something happens to me, you're not going to be raising my child. And we have a—hypothetically a mother who takes the child out of sight for a period of time during a CWS investigation.

"We have a father who comes forward at an early stage in the process of the dependency proceedings and demands [his] rights. I think that person is—is really different than what we see here.

"And again, I am not criticizing Mr. [M.], because you know, as I say, this was a one night encounter, and so I don't see mother as having impeded his ability to inquire or investigate in any fashion. I don't see the Department as having impeded his ability to investigate, inquire, request. I don't see that happening here, and I see it move forward quickly. And [father's counsel] moved forward quickly, as far as her request for that. The paternity test, as I say, well meaning, but did Mr. [M.] know, and when did he know it? When did he know to make that inquiry? He obviously moved here prior to actually finding out whether he is the father or not.

"So mother—I don't think that if I look at it from a *Kelsey S.* perspective, I don't think I have an adequate showing of some impediment that delayed him from establishing a relationship with a three-year[-]old child.

"Number 2. If he had some inclination that he is the father—and that's where I say I am really vague. I don't know whether he had even a mere—even an inclination that he is the father, but certainly he didn't investigate. He could have asked his ex-wife. Apparently he had a good relationship with her. He could have asked the mother. Apparently there is no animosity or hostility in that particular case. So what I

9

court found defendant's showing that mother and the Department impeded father's efforts to establish a relationship with three-year old D.T. inadequate under *Kelsey S.*, *supra*, 1 Cal.4th 816. Specifically, the court found that father could have investigated earlier whether he was the father of D.T. and failed to do so, and that the Department did all it could have done for him in a timely fashion. The court further found it was not in D.T.'s best interest to grant father's section 388 petition and "delay permanency for a longer period of time through another course of reunification." Accordingly, the court declined to designate petitioner a presumed father under *Kelsey S.*

---

characterize there as indifference, certainly not in a pejorative fashion, but indifference nonetheless; nothing was hidden here, didn't follow through, didn't inquire, comes forward with a special needs child after reunification [has] been terminated. In other words, this is a case that's been going on for a substantial period of time. So whether I consider—and I do think that Mr. [M.] obviously is a biological father. I probably would use the terminology from *Zacharia D.* as strictly a biological father rather than a mere biological father. But you know, there are two parents in this particular instance who are presumed. Miss [J.] and Miss [T.]. Who obviously Miss [T.] had to qualify in the Family Code as a presumed parent in order to get to that point. There had to be a donor of DNA material in this particular instance that neither Miss [T.] nor Miss [J.], and those potential donors, one of whom was obviously Mr. [M.], did not come forward nor investigate that. So I think that's how you distinguish this particular case.

"And I think that the 388 standard, as [county counsel] points out, needs to be applied. I also need to look at what is in the best interest of the child, and I think the facts that are cited in the Department's response obviously need to be a part of this record. Here is a special needs child who is on the autism spectrum who was not responding to others, and that that [*sic*] special needs child in the care of his current care providers is responding admirably. Were I to—and I could hear [*sic*] —hear [*sic*] is what I have to weigh to a certain degree. I agree that were Mr. [M.] elevated to LCS status, then there would be a due process right potentially in his particular case. As a mere biological father, I have other things that I need to weigh, and those things that I need to weigh, obviously his interest, which I indicated is sincere and well-meaning, versus a child who is as [minor's counsel] points out, going on his 4th birthday, who has been in the system for a substantial period of time, and that child's right to permanency. And I think in this particular instance that it would not be in the best interests of the child in this particular instance to grant the 388 Petition and delay permanency for a longer period of time through another course of reunification. So the 388 Petition is denied."

## DISCUSSION

Petitioner's sole contention is that the court should have recognized him as a *Kelsey S.* father because he first learned of the possibility he might be D.T.'s biological father in May 2104; he moved back to Eureka and immediately obtained DNA testing to determine paternity; and he contacted the Department right away and inquired about visiting with D.T. but was not offered any visitation.

He argues his ability to take any action earlier in D.T.'s life was thwarted by mother's failure to inform him he might be D.T.'s father or identify him in court as a possible father, and mother's failures in this regard were compounded by the court's striking of the proposed order requiring mother to identify all possible fathers.[6] His ability to take any action earlier in the dependency proceedings was further thwarted by the Department's failure to take any action upon learning he could possibly be the father in May or June 2014; it made no effort to provide him (1) an attorney prior to July 2014, or (2) visitation. We disagree.

A natural (i.e., biological) father can become a presumed father if he receives the child into his home and openly holds out the child as his natural child. (Fam. Code, § 7611, subd. (d).) "Only a 'presumed' father, not one who is merely a 'natural' father, is entitled to reunification services." (*In re Julia U.* (1998) 64 Cal.App.4th 532, 540.) "[I]nterpreting 'parent' [as used in the dependency statutes] to include a strictly biological father would introduce into the dependency context fathers who had never demonstrated any commitment to the child's welfare. [Citation.] Indeed, such an interpretation would arguably grant 'reunification services to a rapist or an anonymous sperm donor.' " (*In re Zacharia D.* (1993) 6 Cal.4th 435, 451 (*Zacharia D.*), quoting from *In re Sarah C.* (1992) 8 Cal.App.4th 964, 975.)

---

[6] Father did not argue court error below or in his writ petition. We therefore consider the assertion of trial court error in this regard forfeited.

11

Father's claim to presumed fatherhood here is nonstatutory; it is based on *Kelsey S., supra*, 1 Cal.4th 816, where our Supreme Court held a natural father's parental right to withhold his consent to an adoption cannot be terminated except upon a showing of unfitness, *if* the natural father has demonstrated his commitment to his parental responsibilities and he was prevented from becoming a presumed father under the statute by mother or other third parties.

In *Kelsey S.*, mother and father had a relationship and father was indisputably the child's biological parent. Father was aware mother planned to place the child up for adoption, to which he objected because he wanted to rear the child. (*Kelsey S., supra*, 1 Cal.4th at p. 821.) Two days after the child's birth he filed a petition in court to establish his parental relationship with the child and obtain custody, and the court issued a restraining order temporarily awarding him custody and staying all adoption proceedings. However, his attempts to serve the order on the prospective adoptive parents were unsuccessful, and they filed an adoption petition. The court then rescinded its prior order and awarded temporary custody to mother, ordering her to live with the child in a shelter. The prospective adoptive parents may have attempted to evade this order for a time by secretly removing the child from their home. (*Id*. at p. 822.) They subsequently filed a petition to terminate father's parental rights. The court allowed the prospective parents to have unsupervised visitation with the child at the shelter; father was allowed only supervised visitation. (*Id*. at pp. 822-823.) At a subsequent hearing, the court ruled natural father did not qualify as a presumed father under the predecessor statute to Family Code section 7611, subdivision (d) and found " 'by a *bare* preponderance' of the evidence" that the child's best interests required termination of father's parental rights. (*Id.* at p. 823.)

Under these circumstances the *Kelsey S.* court held that "[t]he statutory distinction between natural fathers and presumed fathers is constitutionally invalid *only to the extent* it is applied to an unwed father who has sufficiently and timely demonstrated a full

12

commitment to his parental responsibilities. Our statutes . . . are constitutionally sufficient when applied to a father who has failed to make such a showing." (*Kelsey S.*, *supra*, 1 Cal.4th at pp. 849-850.) "If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Id.* at p. 849.) "[T]he threshold constitutional question" is whether the natural father has "demonstrated a sufficient commitment to his parental responsibilities. . . . [T]he trial court must consider whether [the] petitioner has done all that he could reasonably do *under the circumstances.* [¶] If the trial court finds . . . that petitioner failed to demonstrate the required commitment to his parental responsibilities, that will be the end of the matter. He will not have suffered any deprivation of a constitutional right." (*Kelsey S.,* at p. 850.)

Our Supreme Court revisited the *Kelsey S.* again in *Zacharia D.*, *supra*, 6 Cal.4th 435. The court held *Kelsey S.* applies to dependency proceedings (*id.* at p. 451; see also *In re Jerry P.* (2002) 95 Cal.App.4th 793, 797 & fn.1). *Zacharia D.* also held that a biological father who appears after the end of the reunification period must file a section 388 petition to modify the prior orders. (*Zacharia D.,* at p. 454.) Although the biological father in *Zacharia D.* did not file a section 388 petition, the trial court concluded, under section 366.22, that the minor's return to biological father would create a substantial risk of detriment to the minor's physical and emotional well being. (*Id.* at p. 455.) Our Supreme Court found the trial court's finding of substantial risk of detriment was supported by substantial evidence and indicated the court "would have likewise found under section 388 that it was not in Zacharia's best interests to grant [father] reunification services or custody." (*Id.* at p. 456.)

Subsequently, in *In re Vincent M.* (2008) 161 Cal.App.4th 943, the Court of Appeal explicitly held "a biological father seeking reunification with a child, who does

not come forward in the dependency proceeding until after the reunification period has ended, must establish under section 388 that there are changed circumstances or new evidence demonstrating the child's best interest would be promoted by reunification services. The rule is the same whether his paternity was concealed from him or not.  In reaching these conclusions, we hold that [*Kelsey S.*, *supra*,] 1 Cal.4th 816 . . . and cases decided thereafter . . . do not support the dependency court's ruling made at the section 366.26 permanency planning stage that a late appearing father whose paternity was hidden from him by the mother is a presumed father entitled to reunification services without regard to the best interests of the child." (*In re Vincent M.*, *supra*, at p. 947.)

Appellate review of a juvenile court's exercise of discretion is deferential. The test is whether the court's action exceeded the bounds of reason. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) In making this determination, we apply the substantial evidence rule. "Under this standard of review we examine the whole record in a light most favorable to the findings and conclusions of the juvenile court and defer to the lower court on issues of credibility of the evidence and witnesses.  [Citation.]  We must resolve all conflicts in support of the determination and indulge all legitimate inferences to uphold the court's order.  Additionally, we may not substitute our deductions for those of the trier of fact." (*In re Albert T.* (2006) 144 Cal.App.4th 207, 216.)  If there is substantial evidence in the record to support the challenged orders, then the appellate court must affirm.

We apply these standards to our review of a juvenile court's disposition of a petition under section 388, subdivision (a) for a modification of previous orders due to a change in circumstances, or new evidence, as when DNA testing confirms the paternity of a natural father under *Kelsey S.*  (*In re Andrew L.* (2004) 122 Cal.App.4th 178, 190.) " '[T]he burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child.' [Citation.]  'The petition is

14

addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion.' [Citations.]" (*Ibid.*)

The burden of proof with respect to the establishment of presumed father status is the same. "A man who claims entitlement to presumed father status has the burden of establishing by a preponderance of the evidence the facts supporting his entitlement. [Citation.] In carrying that burden, a biological father must establish that he ' "promptly [came] forward and demonstrate[d] a full commitment to his parental responsibilities— emotional, financial, and otherwise. . . ." ' [Citation.] 'In determining whether a biological father has demonstrated such a commitment, "[t]he father's conduct both before and after the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child. . . .' " [Citation.] "A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." [Citation.]' " " (*In re E.T.* (2013) 217 Cal.App.4th 426, 437.)

Petitioner argues the facts of his case are very similar to the situation in *In re Andrew L., supra*, 122 Cal.App.4th 178. In *Andrew L.*, the minor and his de facto parents appealed from the trial court's order granting the biological father's petition for modification, and the Court of Appeal affirmed the trial court's order. (*Id*. at pp. 180-181.)

It is true there are some superficial factual similarities between *Andrew L.*, *supra*, 122 Cal.App.4th 178, and this matter. In both cases, the mothers were drug abusers, and siblings were already in foster care when the baby was taken into protective custody. Both mothers initially identified men other than the petitioning father as the biological father. (*Id*. at p. 181.) Neither petitioner here nor in *Andrew L.* knew he had impregnated

15

the mother.  (*Id*. at p. 184.)  Each child was placed in a loving foster home where he was thriving.  (*Id*. at p. 185.)  However, that is where the similarities end.

In *Andrew L.*, the biological father averred he did not know he might be the father because he had not seen mother in one and a half or two years *and had no way to contact her* until a chance meeting at a restaurant.  (122 Cal.App.4th at pp. 184, 186.)  At that point, she told him she had given birth to a son and he might be the father.  He and the mother remained in contact; within a few days he went with her to visit the baby and repeatedly called the social worker to arrange a DNA test, but the social worker thwarted his efforts to establish a relationship with his son by failing to set up the DNA test, refusing to take his or mother's calls, or answering messages left on his machine, for over six months.  The court found the Department had failed to provide mother with reasonable services and extended the time for reunification.  (*Id.* at p. 182.)  Eventually, father got a court date from a different social worker.  He complained to the judge but after the court date the social worker continued to ignore him.  After a second court date, the social worker finally contacted him.  Four days later the test was performed, which ultimately confirmed his paternity.  (*Id.* at pp. 183-184.)  The trial court credited the biological father's account.  (*Id*. at p. 189.)

In a change of heart, a different social worker recommended offering father reunification services after investigation verified "he had a good relationship with his two other children and regularly paid child support to their mother.  He was employed, lived by himself, and had arrangements for his mother to provide babysitting if he obtained custody of Andrew."  (*In re Andrew L., supra*, 122 Cal.App.4th at p. 188.)  In his section 388 petitions, father expressed a "strong desire to integrate Andrew into his family and provide for his future needs.  He requested reunification services, unmonitored visitation, a release of Andrew to him, and a declaration that he was the presumed father."  (*In re Andrew L.,* at p. 185.)

The Court of Appeal concluded that under these circumstances the biological father had demonstrated under *Kelsey S.* that his "timely, repeated efforts to establish paternity . . . were thwarted by the social worker," and that he had no way to contact mother after their relationship ended. (*Andrew L., supra*, 122 Cal.App.4th at pp. 192-193.) Furthermore, "the Department's investigation showed that [father] was steadily employed, had appropriate visits with Andrew, was a good father to his other two children, had a home waiting for Andrew, and had arranged for his mother to provide babysitting. . . . [H]is strenuous efforts to establish paternity showed that his motivation was a genuine and admirable commitment to the son he had fathered." (*Id.* at p. 193.)

The *Andrew L.* court upheld the trial court's exercise of discretion granting father presumed parent status and reunification services, noting that at all times "the judge was concerned . . . with Andrew's best interests," and "[i]t was not against Andrew's best interest to reunify him with a fit natural parent who made a timely appearance in the case." (*Id.* at p. 195.) The *Andrew L.* court also found it important that when father began contacting the caseworker, Andrew had not been in the prospective adoptive foster home for an extended period of time, an immediate response by the Department would have given the minor little time to bond with the prospective adoptive foster parents, and even by the time the section 388 petition was granted, the minor had lived with them for only nine months. (*Ibid.*)

In our view, this case more closely resembles *Zacharia D., supra,* 6 Cal.4th 435, a case in which our Supreme Court found that "under no view of the evidence did [the alleged father] demonstrate such a commitment, or satisfy *any* of the *Kelsey S.* criteria during the relevant period in this case." (*Id.* at p. 451.) In that case, the alleged father, Javan, "engaged in at least a dozen acts of sexual intercourse with Wendy over a two-week period. There is no evidence that he had any reason to expect that this sexual relationship had not resulted in pregnancy. Rather, Javan testified that this possibility 'didn't occur to [him].' There is also no evidence that Wendy ever hid herself, her

17

pregnancy, or their child from Javan. Javan knew where Wendy was living after November of 1988, and 'could have found her.' In fact, Javan and Wendy had known each other many years, had been high school sweethearts, and eventually were married. Javan's ignorance of Zacharia's existence was born not of malevolence on the part of Wendy or the County, but of his own indifference." (*Id*. at p. 452.) The Court observed: "While under normal circumstances a father may wait months or years before inquiring into the existence of any children that may have resulted from his sexual encounters with a woman, a child in the dependency system requires a more time-critical response. Once a child is placed in that system, the father's failure to ascertain the child's existence and develop a parental relationship with that child must necessarily occur at the risk of ultimately losing any 'opportunity to develop that biological connection into a full and enduring relationship.' " (*Ibid*., quoting *Kelsey S., supra,* 1 Cal.4th at p. 838.)

We stress that under the substantial evidence and abuse of discretion standards, our review is deferential, and we are not at liberty to disregard the trial court's express and implied findings of fact that support its ruling. The record below supports the trial court's factual determinations that petitioner did not do all he could have done under the circumstances to address his parental responsibilities. Petitioner complains his efforts to step up as a parent were thwarted by mother's failure to tell him or the court he might be the father of her baby, but the trial court found otherwise. The court's focus, quite properly, was on what petitioner could reasonably have done *under those circumstances*. Mother was no stranger to him. He had known her for as long as he had known his ex-wife, if not longer. He had maintained a familial friendship with mother throughout his five year marriage to her sister. He knew he had sexual intercourse with her. He knew where she lived. He knew people, other than his ex-wife, who knew her and relayed to him the "rumor" that she had given birth to a son. He maintained contact with his ex-wife. The trial court was entitled to infer that petitioner could have found out sooner through his family connections to mother that mother's baby might be his son.

18

Substantial evidence supports the trial court's conclusion that petitioner could have done more, early on, to ascertain whether he was in fact D.T.'s father, but was indifferent to his possible parental responsibilities until very late in the dependency proceedings.

Similarly, the record supports the trial court's conclusion the social worker here, unlike the social worker in *Andrew L.*, *supra*, 122 Cal.App.4th 178, did not impede petitioner's efforts to establish his paternity. When petitioner materialized in May 2014, he was given information about how to get a paternity test. He apparently waited six weeks, until June 23, to complete testing. The Department was not required to offer visitation or legal counsel to a person who had not yet submitted a DNA sample for paternity testing. Petitioner did not ask a single question about what kind of child D.T. was or what his special needs were, and did not provide the Department with an address or respond to their telephone calls. Under these circumstances, the trial court did not abuse its discretion in declining to confer presumed father status on petitioner under *Kelsey S.*, *supra*, 1 Cal.4th 816.

Finally, the record amply supports the trial court's finding that D.T.'s best interests would not be served by extending reunification services to father. D.T. is a special needs child on the autism spectrum who had blossomed under the care of his prospective adoptive parents. Father's plans to care for D.T. were, in the trial court's words, "vague." D.T. was almost four years old and had been in foster care for almost 18 months by the time of the scheduled section 366.26 hearing. The trial court did not abuse its discretion in denying father's section 388 petition.

## DISPOSITION

W.M.'s petition for an extraordinary writ is denied on the merits. (See Cal. Const., art. VI, § 14; *Kowis v. Howard* (1992) 3 Cal.4th 888, 894; *Bay Development, Ltd. v. Superior Court* (1990) 50 Cal.3d 1012, 1024.) The decision is final in this court immediately. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).) The stay is dissolved forthwith.

19

_____
Dondero, J.

We concur:


_____
Humes, P.J.


_____
Banke, J.